**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LARRY HALL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 11 C 5283 |
| | ) | |
| VILLAGE OF FLOSSMOOR POLICE | ) | Judge John Z. Lee |
| DEPARTMENT, and THE VILLAGE | ) | |
| OF FLOSSMOOR, ILLINOIS, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Larry Hall, a former police officer in the Village of Flossmoor Police Department ("Department"), has sued the Village of Flossmoor ("Village") alleging that the Village denied him promotional and training opportunities and ultimately terminated him based on his race in violation of Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. § 1983, and 42 U.S.C. § 1981.[1]   The Village has moved for summary judgment arguing that Hall was terminated not because of his race but because he repeatedly had sex in his squad car while on duty and later lied about it.   The Village also argues that Hall failed to establish a *prima facie* case that he was denied training and promotional opportunities due to his race.   For the reasons stated herein, the Court grants the Village's motion.

## Facts

### I.    Facts Related to Plaintiff's Termination

On September 27, 2004, Plaintiff Larry Hall, an African-American male, was hired as a patrol officer by the Village of Flossmoor Police Department.   (Def.'s LR 56.1(a)(3) ¶¶ 1, 17.)

---

[1] The Court previously dismissed Hall's claims against the Village of Flossmoor Police Department and his claims for punitive damages.   (*See* 2/12/12 Mem. Op. & Order.)

In addition to his regular duties as a patrol officer, Hall worked as a liaison officer for Homewood-Flossmoor High School, providing security for the high school. (*Id.* ¶ 18.)

In 2007, while working as the high school liaison, Hall met and developed a social relationship with a student, Brittany Thomas. (*Id.* ¶ 30.) By June 2007, shortly after Thomas graduated from high school, Hall's social relationship with Thomas had developed into a sexual relationship. (*Id.*) From June 2007 to June 2009, Hall and Thomas engaged in an on-and-off sexual relationship. (*Id.*)

On July 21, 2009, Malcolm Thomas, the father of Brittany Thomas, went to the Flossmoor Police Department and spoke to Sergeant James Hundley about his belief that Hall was having an inappropriate relationship with his daughter. (*Id.* ¶ 31.) Malcom Thomas signed a Citizen Complaint form and requested that an investigation be conducted. (*Id.*) After receiving Thomas' complaint, Police Chief William Miller ordered Sergeant Hundley and Deputy Chief Michael Pulec to investigate Hall's conduct. (*Id.* ¶ 32.) As part of the investigation, Sergeant Hundley and Deputy Chief Pulec interviewed several witnesses identified by Malcolm Thomas, including several of Brittany's close friends. (*Id.*) Four witnesses informed Deputy Chief Pulec and Sergeant Hundley that Brittany had had sex with Hall in a Department-owned SUV while Hall was on duty. (*Id.*) When Deputy Chief Pulec interviewed Brittany, she confirmed that she had engaged in sex with Hall in a Department-owned SUV while Hall was on duty. (*Id.* ¶ 33.) Brittany informed Pulec that she would get into the SUV and lie down in the back seat while Hall drove to a secluded area of the Flossmoor Country Club where the two would have sex. (*Id.*)

Also as part of their investigation, Deputy Chief Pulec and Sergeant Hundley reviewed Hall's ECOM Instant Message Logs. (*Id.* ¶ 34.) The messages showed that Hall had used

profanity in numerous communications with other members of the Department, he referred to Sergeant Clint Wagner as "clintoris," he referred to another officer as being under the Chief's desk and hearing "gargling" noises, and he referred to Flossmoor residents as "Flossmorons." (*Id.*)  Hall also referred to an eighteen-year-old individual in his messages, whom Deputy Chief Pulec confirmed was Brittany Thomas.  (*Id.*)

Based on the information Deputy Chief Pulec and Sergeant Hundley gathered, they interrogated Hall.  (*Id.* ¶ 35.)  During the interrogation, Hall admitted that he sent the ECOM messages about his superior officers and referred to Flossmoor residents as "Flossmorons."  (*Id.* ¶ 36.)  He also confirmed that the eighteen-year-old individual he referenced in the messages was Brittany Thomas.  (*Id.*)  But Hall repeatedly denied having sex with Thomas while on duty in his Department-issued vehicle.  (*Id.* ¶ 35.)  In total, he denied the allegations about having sex with Thomas while on duty at least fourteen times during the investigation.  (*Id.*)  Ultimately, however, Hall admitted to having sex with Thomas while he was on duty.  (*Id.*)

When the investigation was completed, Deputy Chief Pulec recommended to Chief Miller that Hall be charged with violating multiple Department rules and policies.  (*Id.* ¶ 38.)  Individual officers' conduct is governed by, among other things, the Department's Rules and Regulations, General Orders, and Procedures.  (*Id.* ¶ 8.)  The Rules and Regulations prohibit unbecoming conduct (Rule B); neglect of duty (Rule G); untruthfulness (Rule J); and insubordination (Rule L).  (*Id.*)  General Order 96-20 requires officers to "at all times, maintain an alert and businesslike manner . . . and not leave his/her beat except for some police purpose." (*Id.* ¶ 13.)  Additionally, Procedure 5.310 prohibits the improper use of Mobile Data Terminals. (*Id.* ¶ 8.)  Deputy Chief Pulec recommended that Hall be charged with violating Rules B, G, J, and L, and Procedure 5.310.  (*Id.* ¶ 38.)

After receiving Deputy Chief Pulec's recommendations, Chief Miller discussed Hall's employment with the Village Manager, Bridget Wachtel. (*Id.* ¶ 39.[2]) Miller and Wachtel determined that Hall should be terminated, and on November 20, 2009, Chief Miller issued Hall a termination letter. (*Id.*, Ex. 24, Termination of Employment Letter, 1.) The letter recounted the allegations, described the investigation in detail, and noted Hall's violations of Department policy, including violations of Rules B (unbecoming conduct), G (neglect of duty), J (standards of conduct), and L (insubordination), General Order 96-20 (patrol officer's duties and responsibilities), and Procedure 5.310 (mobile data terminals). (*Id.*, Ex. 24, Termination of Employment Letter, 1-4.) Other than receiving one verbal warning for sleeping on duty, Hall had not received any other discipline until he was terminated. (*Id.* ¶ 19.)

In August 2011, Hall sued the Village alleging that he was terminated based on his race. (Compl. ¶¶ 14-25.) Hall contends that his termination was based on race because other Caucasian and non-African-American officers violated Department policy and procedure but were not terminated. (*Id.*) The following violations of Department policy by other officers are undisputed: while on duty, Officer Brian Brosnan and Sergeant Heward,[3] both Caucasian officers, traveled to Sergeant Heward's residence in Manteno, IL, outside of the Village of Flossmoor, to move Sergeant Heward's personal generator. (Pl.'s LR 56.1(b)(3)(C) ¶ 48.) At the time, they were the only officers on patrol in Flossmoor. (*Id.*) While they were in Manteno, they received a call regarding a potential domestic violence situation in Flossmoor, and they had

---

[2] Plaintiff "denies the allegations of ¶ 39," but provides no evidence or citation to the record to support the denial of the fact that Chief Miller discussed Hall's employment with Village Manager, Bridget Wachtel, or that Chief Miller and Wachtel decided to terminate Hall. (Pl.'s LR 56.1(b)(3)(B) ¶ 39.) "[A] general denial is insufficient to rebut a movant's factual allegations; the nonmovant must cite specific evidentiary materials justifying the denial." *Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000). Thus, these facts are deemed admitted for the purposes of this motion.

[3] The parties have not provided Sergeant Heward's first name.

to use their lights and sirens to respond to the call. (*Id.*) As a result of their conduct, Sergeant Howard received a ten-day suspension, and Officer Brosnan received a written warning. (*Id.*) Additionally, Officer Mark Swanson, a Hispanic officer, violated Department policy during an automobile pursuit. (*Id.* ¶ 47.) The pursuit resulted in a car accident, and Officer Swanson received a three-day suspension. (*Id.*)

## II. Facts Related to Plaintiff's Denial of Promotional and Training Opportunities

In addition to wrongful termination, Hall contends that he was denied promotional and training opportunities because of his race, including being denied a Field Training Officer ("FTO") position and being denied supplemental Drug Abuse Resistance Education ("D.A.R.E") training. (Compl. ¶¶ 26-37.) In September 2008, an FTO position was available in the Department. (Def.'s LR 56.1(a)(3) ¶ 25.[4]) An FTO is an officer that is assigned to a new officer to serve as a trainer and mentor for the new officer. (*Id.* ¶ 24.[5]) FTOs receive one hour of additional pay for each day they actively train another officer. (*Id.*) Deputy Chief Pulec and

---

[4] Plaintiff "denies the allegations of ¶ 25," but provides no specific evidence to support the denial. (Pl.'s LR 56.1(b)(3)(B) ¶ 25.) As stated, a general denial is insufficient to rebut a movant's factual allegations; the nonmovant must cite specific evidentiary materials justifying the denial. *See Malec*, 191 F.R.D. at 584. Plaintiff also states in response to ¶ 25 that "Plaintiff testified as to the retention and promotion of less qualified and nonqualified Caucasian persons, including Officer Michael Carden, over Plaintiff that constituted discrimination." (Pl.'s LR 56.1(b)(3)(B) ¶ 25.) Such a statement is argumentative and offers a legal conclusion and, therefore, will not be considered by the Court. *See e.g.*, *Greer v. Bd. of Educ.*, 267 F.3d 723, 727 (7th Cir. 2001) (self-serving legal conclusions are not statements of fact and do not suffice as a proper response to a Rule 56.1 statement). Thus, the facts in Defendant's LR 56.1(a)(3) ¶ 25 are deemed admitted for the purposes of this motion.

[5] Plaintiff "denies the allegations of ¶ 24," but provides no evidence or citation to the record to support the denial of Defendant's description of an FTO's responsibilities. Thus, the facts in Defendant's LR 56.1(a)(3) ¶ 24 about an FTO's responsibilities are deemed admitted. In that same response, Plaintiff also states that "Plaintiff testified that an FTO receives additional compensation." (Pl.'s 56.1(b)(3)(B) ¶ 24.) Defendant's ¶ 24 states that "FTO's . . . receive additional pay when they are actually training an officer" and that "they are paid one hour of additional pay for each day while they actively train another officer." (Def.'s LR 56.1(a)(3) ¶ 24.) The Court does not see the difference between Defendant's statement and Plaintiff's response, and Local Rule 56.1(b)(3)(B) responses are "not the place for purely argumentative

Sergeant Hundley recommended to Chief Miller that Officer Michael Carden, a Caucasian officer, be appointed to the position. (*Id.* ¶ 25.) Officer Carden held a bachelor's degree, and Deputy Chief Pulec and Sergeant Hundley believed that Officer Carden was patient, exhibited initiative, was committed and knowledgeable of state and local laws, and followed Department rules and regulations. (*Id.*)

Officer Carden was assigned to the FTO position over all other eligible patrol officers, including Hall, Officer Dave Freeman, a Caucasian officer, Officer Mark Cagle, a Caucasian officer, and Officer John Schade, a Caucasian officer. (*Id.*) At the time, Officers Freeman and Hall held bachelor's degrees, and Officers Freeman and Schade had more experience than Hall. (*Id.*; Hall Dep. at 19: 21-24, 20: 1-2.) Hall alleges, and Defendant disputes, that in reference as to why Hall was denied the FTO position in favor of Officer Carden, Deputy Chief Pulec told Hall, "Mike[']s [Carden] a book guy, Lar you're a street guy." (Pl.'s LR 56.1(b)(3)(C) ¶ 49.)

Although Hall was not appointed to the FTO position, he did receive several specialty assignments in the Department, including tactical officer, juvenile officer, acting shift leader, and the Department's only D.A.R.E officer. (Def.'s LR 56.1(a)(3) ¶ 18.) To become a D.A.R.E. officer, Hall attended a two-week training program in Peoria, Illinois. (*Id.* ¶ 29.) Hall requested that the Department pay for his travel to Florida to receive supplemental D.A.R.E. training, but the Department denied his request. (*Id.*) Hall also participated in the Department's "Tuition Refund Program," a program that allowed officers to receive tuition reimbursement if they were "enrolled in an accredited university, college, or adult education program and the course and/or degree program being undertaken is related to his duties with the Village." (*Id.* ¶¶ 20-21.) Chief Miller and Village Manager Wachtel approved multiple requests from Hall for tuition

---

denials." *Malec*, 191 F.R.D. at 584. Thus, the pay structure of the FTO position described in Defendant's LR 56.1(a)(3) ¶ 24 is also deemed admitted.

reimbursements for the master's degree in public administration he completed at Governors State University, a public university in University Park, Illinois. (*Id.*)

The Village now moves for summary judgment on all claims.

<u>**Discussion**</u>

Federal Rule of Civil Procedure 56(a) provides that summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the moving party has sufficiently demonstrated the absence of a genuine issue of material fact, the nonmoving party must then set forth specific facts showing there are disputed material facts that must be decided at trial. *Id.* at 321-22.

**I.      Termination Claim**

Hall alleges that the Village terminated him based on his race in violation of Title VII, §1981, and § 1983. Under Title VII, it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). Under § 1981, "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to the full and equal benefit of all laws . . . as is enjoyed by white citizens." 42 U.S.C. § 1981. And under § 1983, public employees can sue their employers for discrimination. *See Trigg v. Ft. Wayne Cmty. Schs.*, 766 F.2d 299, 300-01 (7th Cir. 1985). The same requirements for proving discrimination apply to claims under Title VII, § 1981, and § 1983. *See Egonmwan v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 845, 850 n.7 (7th Cir. 2010). Thus, the analysis is the same for all of Hall's claims of race discrimination concerning his termination.

To overcome Defendant's motion for summary judgment, Hall may proceed under either the direct or indirect method of proving that Defendant took an adverse employment action against him because of his race. *See Raymond v. Ameritech Corp.*, 442 F.3d 600, 610 (7th Cir. 2006). Hall does not attempt to establish discrimination via the direct method. Thus, if he is to survive Defendant's motion for summary judgment, he must do so under the indirect method.

The indirect method requires Hall to proceed under the burden-shifting approach set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801-02 (1973). *See McGowan v. Deere & Co.*, 581 F.3d 575, 579 (7th Cir. 2009). The *McDonnell Douglas* approach requires that, to survive summary judgment, Hall must establish a *prima facie* case of discriminatory termination by showing that: (1) he is a member of a protected class; (2) he was performing well enough to meet his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees outside his protected class were treated more favorably. *Id.* If Hall makes this *prima facie* showing, the burden of production shifts to the Village to articulate a legitimate, non-discriminatory reason for Hall's termination. *See id.* at 454. If the Village can articulate such a reason, the burden of production shifts back to Hall to show that the Village's stated reason is a pretext. *See id.* In this context, a pretext is "a lie, specifically a phony reason for some action." *Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 983 (7th Cir. 1999).

It is undisputed that Hall satisfies the first and third prongs of his *prima facie* case. As an African-American, Hall belongs to a protected class, and he suffered an adverse employment action when his employment was terminated. Defendant contends, however, that Hall has failed to create a triable issue of fact as to prongs two and four. Specifically, Defendant argues that Hall cannot establish that: (1) Hall met the Village's legitimate expectations, or (2) similarly

situated employees outside Hall's protected class were treated more favorably. The Court agrees.

### A. Legitimate Expectations

When considering whether an employee is meeting an employer's legitimate expectations, the Court looks to whether the employee was performing adequately at the time of the adverse employment action. *Dear v. Shinseki*, 578 F.3d 605, 610 (7th Cir. 2009) (citing *Hong v. Children's Mem. Hosp.*, 993 F.2d 1257, 1262 (7th Cir. 1993)). An employee who violates his employer's established policies fails to perform adequately or meet his employer's legitimate expectations. *See Anders v. Waste Mgmt. of Wisc.*, 463 F.3d 670, 676 (7th Cir. 2006).

Here, it is undisputed that having sex in a Department squad car while on duty is a violation of the Department's Rules and Regulations. (Def.'s LR 56.1(a)(3) ¶ 37.) Hall admitted that he had sex with Brittany Thomas in his Department squad car while he was on duty on at least two separate occasions. (*Id.* ¶ 35.) It is also undisputed that being untruthful during a formal Department interrogation is a violation of the Department's Rules and Regulations. (*Id.* ¶ 37.) Before he ultimately admitted to his misconduct, Hall denied having sex with Brittany Thomas while on duty in his Department-issued vehicle at least fourteen times during the investigation. (*Id.* ¶ 35.) It is further undisputed that sending inappropriate MDT messages is a violation of the Department's MDT policy. (*Id.* ¶ 37.) In his MDT messages, Hall referred to (1) a superior officer, Sergeant Clint Wagner, as "clintoris;" (2) another officer as being under the Chief's desk and hearing "gargling" noises; and (3) Flossmoor residents as "Flossmorons." (*Id.* ¶ 34.)

Deputy Chief Pulec and Sergeant Hundley conducted a full investigation into Hall's actions and determined that Hall had violated: (1) Department Rules and Regulations B

(unbecoming conduct), G (neglect of duty), J (standards of conduct), and L (insubordination); and (2) Department Procedure 5.310 (mobile data terminals). (*Id.* ¶¶ 8, 38.) When Deputy Chief Pulec presented the results of his investigation to Chief Miller, Chief Miller discussed Hall's employment with the Village Manager, Bridget Wachtel, and they also decided that Hall's conduct was unacceptable and that Hall should be terminated. (*Id.* ¶ 39.) The undisputed record reveals that at the time of his termination, Hall had violated multiple Department polices and, therefore, failed to meet the Department's legitimate expectations.

Hall argues that at the time of his termination he was meeting the Department's legitimate expectations because outside of the conduct at issue in this case, he did not receive any other discipline, except for one verbal warning for sleeping on duty in 2009, and his personnel file contained numerous commendations, letters of recommendation, and other positive documentation. (Pl.'s Resp. 5.) It is undisputed that until Hall's termination, he did not receive any discipline other than one verbal warning for sleeping on duty in 2009. (Def.'s LR 56.1(a)(3) ¶ 19.) But Hall provides no support for his claims about positive documentation in his personnel file other than his own deposition. (Pl.'s LR 56.1(b)(3)(B) ¶ 19.) Even assuming that his claims about the positive documentation in his personnel file are true, Hall still has not created a triable issue of fact as to whether he was meeting the Department's legitimate expectations. Although indicators of past conduct can be relevant to the question of whether an employee is meeting legitimate expectations, they cannot "demonstrate the adequacy of performance at the crucial time when the employment action is taken." *Fortier v. Ameritech Mobile Comuns.*, 161 F.3d 1106, 1112 (7th Cir. 1998); s*ee also Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002) ("In most cases, when a district court evaluates the question of whether an employee was meeting an employer's legitimate expectations, the issue is not the

employee's past performance but 'whether the employee was performing well at the time . . .'") (internal citations omitted). As stated, the record reveals that at the time of his termination, there was concrete evidence supported by Hall's own admissions that Hall had violated numerous Department policies by having sex on multiple occasions in a Department-issued vehicle while on duty and subsequently lying about it during a formal Department investigation.

Hall also contends that he was meeting his employer's legitimate expectations because his conduct did not lead to any identifiable injury or repercussions that may have resulted from an inattention to duty. (Pl.'s Resp. 6.) But whether Hall's conduct caused any immediate injuries or negative repercussions is not the issue under the second prong of the *McDonnell Douglas* test. The issue is simply whether Hall violated Department policies governing officer conduct, which he did, as he himself admitted and as determined by the Department's investigation and Chief Miller's and Village Manager Wachtel's review of the investigation's findings. (Def.'s LR 56.1(a)(3) ¶¶ 37-39; Hall Dep. at 102:16-23; 103:1; 203:5-13.) In sum, Hall has not created a triable issue as to whether he was meeting his employer's legitimate expectations at the time of his termination, and he cannot, therefore, establish the second prong of his *prima facie* case.

### B. Similarly Situated Employees

Hall also cannot meet the fourth prong of his *prima facie* burden, that similarly situated employees outside his protected class were treated more favorably. Similarly situated employees are employees who are "directly comparable in all material respects, which includes showing that the coworkers engaged in comparable rule or policy violations." *Patterson v. Ind. Newspapers, Inc.*, 589 F.3d 357, 365-66 (7th Cir. 2009).

Hall contends that other Caucasian and non-African-American police officers and sergeants in the Department were similarly situated because they held the same job as Hall, violated Department polices and procedures, and were not terminated. (Pl.'s Resp. 6.) Specifically, Hall identifies as comparators Officers John Schade, Brian Brosnan, Everett Yost, Clint Wagner, Eddie Sailsbury, Mark Cagle, Lisa Bapp, and Mark Swanson, and Sergeants Heward, Karner, Tencza, and Kamlieter.[6] (Pl.'s LR 56.1(b)(3)(C) ¶¶ 45, 47.) The undisputed summary judgment record, however, shows that none of these employees qualify as similarly situated employees outside of Hall's protected class who were treated more favorably than Hall.

As an initial matter, Hall's allegations concerning Officers Schade, Yost, Wagner, Sailsbury, Cagle, and Bapp, and Sergeants Karner, Tencza, and Kamlieter are not properly supported. Hall alleges that these officers are comparators in both his Local Rule 56.1(b)(3)(B) responses to Defendant's Local Rule 56.1(a)(3) statement and his Local Rule 56.1(b)(3)(C) statement of additional facts. Plaintiff's Local Rule 56.1(b)(3)(B) responses must "respon[d] to each numbered paragraph in the moving party's [Local Rule 56.1(a)(3)] statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." L.R. 56.1(b)(3)(B). In his responses, Hall repeats in seven separate responses that he "testified in detail" that these officers "had violated the Defendants' established policies and procedures" and that they were "either not subject to discipline or were subject to progressive discipline and not discharged." (Pl.'s LR 56.1(b)(3)(B) ¶¶ 7, 8, 37, 38, 39, 40, 42.) But none of Hall's seven recitations of this statement is responsive to the corresponding facts alleged in Defendant's Local Rule 56.1(a)(3) statement. For example, in response to the Village's statement that it "maintain[ed] a personnel manual that governs the terms and conditions of employment for all Village employees" and that the manual included an "equal

---

[6] Plaintiff does not provide the first names of Sergeants Heward, Karner, Tencza, and Kamlieter.

employment opportunity policy, which prohibit[ed] discrimination in all aspects of employment on the basis of race . . .," Hall "admit[ted] that the Village personnel manual . . . exists, but deni[ed] that the policies regarding discrimination contained in the personnel manual . . . were followed," and then stated that other Caucasian officers "had violated the Defendants' established policies and procedures."  (Pl.'s LR 56.1(b)(3)(B) ¶ 7.)  The portion of Hall's response denying that the Department followed the personnel manual is unresponsive to Defendant's factual statement that the personnel manual existed and that it contained an anti-discrimination policy.  That portion of Hall's response also improperly states a legal argument. *See Judson Atkinson Candies, Inc. v. Latini-Hoberger Dhimantec*, 529 F.3d 371, 382 n.2 (7th Cir. 2008) ("It is inappropriate to make legal arguments in a Rule 56.1 statement of facts.") (internal citations omitted).  Perhaps, more importantly, Hall fails to adequately support such contentions as discussed below.

The Seventh Circuit has emphasized the importance of the local rules and has "consistently and repeatedly upheld a district court's discretion to require strict compliance with its local rules governing summary judgment." *Metro. Life Ins. Co. v. Johnson*, 297 F.3d 558, 562 (7th Cir. 2002) (internal quotation marks omitted).  It is the function of the Court, with or without a motion to strike, to "review carefully statements of material facts and to eliminate from consideration any argument, conclusions, and assertions that are unsupported by the documented evidence of record offered in support of the statement." *Phillips v. Quality Terminal Servs., LLC*, 855 F. Supp. 2d 764, 771 (N.D. Ill. 2012).  Because Hall's statements in his Local Rule 56.1(b)(3)(B) responses concerning the conduct of Officers Schade, Yost, Wagner, Sailsbury, Cagle, Bapp, Karner, Tencza, and Kamlieter are unresponsive and are improper legal argument,

they are stricken.[7] *See, e.g.*, *Phillips*, 855 F. Supp. 2d at 771-72 ("any statements or responses that contain legal conclusions or argument . . . will not be considered by the Court in ruling on the summary judgment motions."); *Ellman v. Woodstock #200 Sch. Dist.*, No. 99 C 50017, 2001 WL 218958, at *1 (N.D. Ill. Feb. 26, 2001) (striking portions of 56.1 statements that "contain legal arguments and conclusions").

Hall also alleges that Officers Schade, Yost, Wagner, Sailsbury, Cagle, Bapp, Karner, Tencza, and Kamlieter are comparators in his Local Rule 56.1(b)(3)(C) statement of additional facts. In his Local Rule 56.1(b)(3)(C) statement, Hall repeats the statement that he made seven times in his Local Rule 56.1(b)(3)(B) responses: that he "testified in detail" that these Caucasian officers "had violated the Defendants' established policies and procedures" and that they were "either not subject to discipline or were subject to progressive discipline and not discharged." (Pl.'s LR 56.1(b)(3)(C) ¶ 45.) Local Rule 56.1(b)(3)(C) requires the non-movant to include with any additional facts "references to the affidavits, parts of the record, and other supporting materials relied upon." Such references must be specific and "include page (or paragraph) numbers, as opposed to simply citing an entire deposition, affidavit, or other exhibit document." *Malec*, 191 F.R.D. at 583 (citing *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994)).

Here, to support his assertion in his Local Rule 56.1(b)(3)(C) statement of additional facts that Officers Schade, Yost, Wagner, Sailsbury, Cagle, Bapp, Karner, Tencza, and Kamlieter are comparators, Hall cites his own deposition and a ten-page, single-spaced memorandum he submitted to the Equal Employment Opportunity Commission ("EEOC"). (Pl.'s LR

---

[7] Hall's recitation that he "testified in detail" that these officers "had violated the Defendants' established policies and procedures" and that they were "either not subject to discipline or were subject to progressive discipline and not discharged" is equally unresponsive and argumentative, and is therefore stricken, in his responses to Defendant's LR 56.1(a)(3) ¶¶ 7, 8, 37, 38, 39, 40, and 42.

56.1(b)(3)(C) ¶ 45.) His deposition citation references just two pages of his 238-page deposition and the two pages he cites simply refer to other portions of the deposition and the complaint; they contain no specific statements about how the Caucasian officers violated Department policy or how they were disciplined. (*Id.*) Hall's citation to his EEOC memorandum is equally vague. The citation refers to the entire memorandum, without specifying any page numbers, paragraph numbers, or other portions of the document that might support his allegations that these other officers are comparators. (*Id.*) Such vague citations make it impossible to verify factual assertions. "[D]istrict courts are not obliged in our adversary system to scour the record looking for factual disputes." *Waldridge*, 24 F.3d at 922. "Judges are not like pigs, hunting for truffles buried" in the record. *United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir. 1991). Because ¶ 45 in Hall's Local Rule 56.1(b)(3)(C) statement of additional facts concerning Officers Schade, Yost, Wagner, Sailsbury, Cagle, Bapp, Karner, Tencza, and Kamlieter is not properly supported by specific citations to the record, it is stricken. *See Malec*, 191 F.R.D. at 583 ("Factual allegations not properly supported by citation to the record are nullities.")

Consequently, the only alleged comparators that are properly before the Court are Officer Mark Swanson, Officer Brian Brosnan, and Sergeant Heward. It is undisputed that Officer Swanson, a Hispanic officer, violated Department policy during an automobile pursuit. (Pl.'s LR 56.1(b)(3)(C) ¶ 47.) The pursuit resulted in a car crash, and Officer Swanson received a three-day suspension for his policy violation. (*Id.*) It is also undisputed that Officer Brian Brosnan and Sergeant Heward, while on duty as the only officers on patrol in Flossmoor, traveled to Sergeant Heward's residence in Manteno, IL, outside of Flossmoor, to move Sergeant Heward's personal generator. (*Id.* ¶ 48.) While they were in Manteno, they received a call about a potential domestic violence situation in Flossmoor, which required them to use their lights and

sirens to respond. (*Id.*) As a result of their conduct, Sergeant Howard received a ten-day suspension, and Officer Brosnan received a written warning. (*Id.*)

Hall alleges that these three officers are comparators because they also violated Department policy but were treated more favorably than Hall because they were not terminated. But as mentioned, a comparator must be "directly comparable" to Hall in all material respects, which includes showing that the comparator engaged in "comparable rule or policy violations." *See Patterson*, 589 F.3d at 365-66. There is absolutely nothing in the record to suggest that Officers Swanson, Brosnan, or Heward had engaged in improper sexual encounters in a Department-issued vehicle while they were on duty. There is also nothing in the record to suggest that any of them lied during a formal investigation to cover up their actions. Indeed, the Department has never had another officer have sex while on duty and subsequently lie about it. (Def.'s LR 56.1(a)(3) ¶ 41.[8]) Hall's actions were unprecedented, and it is a legitimate

---

[8] Plaintiff alleges that "Officer Yost was involved in an on-duty accident and that Officer Yost prepared a police report that contained false information." (Pl.'s LR 56.1(b)(3)(B) ¶ 41.) But Plaintiff does not assert this in his Local Rule 56.1(b)(3)(C) statement of additional facts. It is inappropriate for a non-movant to include additional facts for the Court to consider in a Local Rule 56.1(b)(3)(B) response without also including them in a Local Rule 56.1(b)(3)(C) statement of additional facts. *See Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 643-44 (7th Cir. 2008) (affirming the district court's refusal to consider additional facts set forth in the non-movant's Local Rule 56.1(b)(3)(B) response); *Easton v. Nolan*, 416 F. App'x 569 (7th Cir. 2011) (same). Indeed, "Local Rule 56.1 requires specifically that a litigant seeking to oppose a motion for summary judgment file a response that contains a separate statement" under Local Rule 56.1(b)(3)(C) "of any additional facts that require the denial of summary judgment." *Chicon v. Exelon Generation Co.*, 401 F.3d 803, 809 (7th Cir. 2005) (omission in original) (quoting N.D. Ill. L.R. 56.1(b)(3)(C)) (internal quotation marks omitted); *Parvati Corp. v. Cit of Oak Forest*, 2012 WL 957479, at *1 (N. D. Ill. Mar. 20, 2012) ("Also, Local Rule 56.1(b)(3)(C) requires the nonmoving party to present a *separate* statement of additional facts that requires the denial of summary judgment.") (emphasis added); *Malec*, 191 F.R.D. at 584 ("Simply providing additional facts in one's responsive memorandum is insufficient to put those facts before the Court") (citing *Midwest Imports, Ltd. V. Coval*, 71 F.3d 1311, 1317 (7th Cir.1995)). The rationale behind this rule is that if the non-movant includes additional facts in only the Local Rule 56.1(b)(3)(B) response, the movant is unfairly deprived of a vehicle under Local Rule 56.1 to dispute those facts because the rule permits movants to reply only to a Local Rule 56.1(b)(3)(C) statement, not a Local Rule 56.1(b)(3)(B) response. *See* N.D. Ill. L.R. 56.1(a)(3); *Johnson v. County of Cook*, 2012 WL 2905485, at *13 (N.D. Ill. Jul. 16, 2012). Therefore, Hall's allegations about Officer Yost will be disregarded. *See Ciomber*, 527 F.3d at 643; *Wojtanek v.*

expectation of the Village to require its police officers to be honest, especially in formal investigations. *See* Department Rule J (requiring truthfulness). Thus, Hall has failed to identify similarly situated employees outside his protected class who were treated more favorably than him and, therefore, cannot establish the fourth prong of his *prima facie* case.

### C. Pretext

But even if Hall could make a *prima facie* case of race discrimination under the indirect method, the Village is entitled to summary judgment for another separate reason: the Village has provided legitimate, nondiscriminatory reasons for Hall's termination, and Hall cannot prove that these reasons are a pretext for race discrimination. Under the *McDonnell Douglas* burden-shifting analysis, if Hall makes a *prima facie* showing, the burden of production shifts to Defendant to articulate a legitimate, non-discriminatory reason for Hall's termination. *See McGowan*, 581 F.3d at 579. If Defendant offers a legitimate, nondiscriminatory reason for the termination, Hall can survive summary judgment only by proving that the employer's legitimate, nondiscriminatory reason is merely a pretext for discrimination. *See id.* In this context, pretext "means a dishonest explanation, a lie rather than an oddity or an error." *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir. 2000). "A 'pretext for discrimination' means more than an unusual act; it means something worse than a business error; 'pretext' means deceit used to cover one's tracks." *Id.* at 684. A plaintiff alleging pretext must establish that: (1) the proffered reasons are factually baseless; (2) the proffered reasons were not the actual motivation for the decision; or (3) the proffered reasons were insufficient to motivate the decision. *See Baron v. City of Highland Park*, 195 F.3d 333, 341 (7th Cir. 1999).

---

*Consolidated Container Co.*, 2011 WL 4036126, at *5 (N.D. Ill. Sept. 12, 2011) ("[A] court may disregard any additional facts in a party's response to the opposing party's statement of facts").

The Village contends that Hall was terminated because he had repeated sex in a Department-issued vehicle while he was on duty and subsequently lied about it multiple times during a formal Department investigation. Hall argues that these reasons are pretextual and that he was really fired because he is African-American. As stated, Hall admitted to having sex with Brittany Thomas in his Department squad car while he was on duty, he admitted that this violated Department policy, he admitted to being untruthful during a formal Department interrogation, and he admitted that this untruthfulness also violated Department policy. (Def.'s LR 56.1(a)(3) ¶¶ 35, 37; Hall Dep. at 102:16-23; 103:1; 203:5-13.) Hall has provided no evidence that the Village's decision to terminate him based on this conduct was factually baseless, not the actual motivation for the decision, or insufficient to motivate the decision. Thus, Hall cannot establish that Defendant's nondiscriminatory reasons for terminating him were pretext for race discrimination. For these reasons, the Court grants Defendant's motion for summary judgment on Hall's claims that he was terminated based on race discrimination.

## II.     Failure to Promote

In addition to his claims of wrongful termination, Hall claims that he was not appointed to the FTO position in September 2008 because of his race in violation of Title VII, § 1983, and § 1981. These claims, however, are time-barred and cannot stand. Under Title VII, a plaintiff must file a claim of discrimination to the EEOC within 300 days of the alleged failure to promote. 42 U.S.C. § 2000e-5(e)(1); *Bannon v. Univ. of Chicago*, 503 F.3d 623, 628 (7th Cir. 2007). Hall filed his Charge of Discrimination with the Illinois Department of Human Rights and the EEOC on February 23, 2010. (Def.'s LR 56.1(a)(3) ¶ 27.) As a result, he can sue only for events that happened on or after April 29, 2009. Therefore, to the extent his failure-to-

promote claim is based on being passed over as an FTO officer in September 2008, it is time-barred.

In his deposition, Hall admitted that his failure-to-promote claim is based solely on the failure to select him for the FTO position.  (Pl.'s Ex. 1(a): Hall Dep. at 124:9-24, 125:1.)  Additionally, in his memorandum to the EEOC, Hall stated that he was "denied *a* promotional opportunity."  (Pl.'s Ex. 2 at 11.) (emphasis added).  In his Opposition Brief, however, Hall states that his failure-to-promote claims are not time barred because he "applied for multiple promotional opportunities, including, but not limited to, Field Training Officer, and was denied said promotions over less qualified and non-qualified Caucasian police officers."  (Pl.'s Resp. 9.)  This directly contradicts his sworn deposition testimony, and he provides no explanation or evidence in his brief or Local Rule 56.1(b)(3)(C) statement of additional facts as to what other "promotional opportunities" he was denied.  Although at the summary judgment stage the Court must interpret the evidence in the light most favorable to Plaintiff, *Holland v. Jefferson Nat'l Life Ins. Co.*, 883 F.2d 1307, 1312 (7th Cir. 1989), that does not allow him to contradict deposition testimony with later-filed contradictory briefs, especially when the later-filed briefs lack any specific factual assertions.  *See Bank of Ill. v. Allied Signal Restraint Sys.*, 75 F.3d 1162, 1168-69 (7th Cir. 1996) ("We have long followed the rule that parties cannot thwart the purposes of Rule 56 by creating 'sham' issues of fact with affidavits that contradict their prior depositions.")  Because Hall unequivocally testified in his deposition that the FTO position was the only alleged promotion he was denied, he cannot attempt to create an issue to avoid summary judgment with a newly filed brief which contradicts his earlier testimony.  Thus, Hall's Title VII claim for failure to promote is time-barred.

Similarly, Hall's § 1983 and § 1981 claims for failure to promote are time-barred. Both statutes have a two-year limitations period, which starts to run when the allegedly discriminatory decision is made. *See Williams v. Lampe*, 399 F.3d 867, 870 (7th Cir. 2005) (§ 1983); *Walker v. Abbott Labs.*, 340 F.3d 471, 474 (7th Cir. 2003) (§ 1981). It is undisputed that Sergeant Hundley and Deputy Chief Pulec recommended that Chief Miller appoint Officer Michael Carden to the FTO position in September 2008. (Def.'s LR 56.1(a)(3) ¶ 25.) Thus, Hall could bring his § 1983 and § 1981 discrimination claims relating to the FTO position until only September 2010. It is undisputed that Hall filed his complaint alleging § 1983 and § 1981 violations on August 3, 2011. (*Id.* ¶ 28.) Consequently, his § 1983 and § 1981 failure-to-promote claims are also time-barred.

### III.    Failure to Train

Hall also alleges that he was denied training opportunities, including supplemental D.A.R.E. training, based on race discrimination in violation of Title VII, § 1981, and § 1983. (Pl.'s Resp. 9.) As discussed, the same requirements for proving discrimination apply to claims under Title VII, § 1981, and § 1983. *See Egonmwan*, 602 F.3d at 850. Additionally, like a wrongful termination race discrimination claim, a failure-to-train claim can be established through either the direct method of proof or the indirect burden-shifting method established through *McDonnell Douglas*. *Pafford v. Herman*, 148 F.3d 658, 667 (7th Cir. 1998). Hall provides no direct evidence of discrimination, so he must proceed through the indirect method.

The *prima facie* case for a failure-to-train claim under the indirect method requires that Hall show: (1) he belongs to a protected class; (2) the Department provided training to its employees; (3) he was eligible for training; and (4) that he was not provided training under circumstances giving rise to an inference of discrimination, *i.e.* that he was denied training given

to other similarly situated employees who were not members of the protected group.  *Id.*  It is undisputed that (1) Hall, as an African-American, belongs to a protected class; (2) the Department provided training to its employees; and (3) Hall was eligible for training.  The fourth factor is the point of contention here.

Hall alleges that he "applied to training opportunities, including supplemental D.A.R.E. training, but was denied said training opportunities while Caucasian police officers were granted permission to attend requested events, such as shooting competitions, that are not classified as training opportunities."  (Pl.'s Resp. 9.)  But Hall has failed to identify similarly situated employees.  Hall was the Department's only D.A.R.E. officer.  (Def.'s LR 56.1(a)(3) ¶ 29.)  To be trained as a D.A.R.E. officer, he attended a two-week training program in Peoria, Illinois. (*Id.*)  He requested that the Department pay for him to travel to Florida for additional D.A.R.E. training and the Department denied his request.  (*Id.*)  But the Department has never paid for any officers to travel to Florida for D.A.R.E. training and there is nothing in the record that indicates that it has.  (*Id.*)  Additionally, although Hall did not attend D.A.R.E. training in Florida, he was afforded other training opportunities while at the Department, including tuition reimbursements for most of his master's degree in public administration at Governors State University.  (*Id.* ¶ 21.)

Moreover, Hall received specialty appointments outside of formal training opportunities. Hall claims that other Caucasian officers were granted permission to attend events such as shooting competitions that Hall admits were not classified as training opportunities.  (Pl.'s Resp. 9.)  Hall, however, received his own special assignments, including appointments as tactical officer, juvenile officer, acting shift leader, and the Department's only D.A.R.E. officer.  (Def.'s LR 56.1(a)(3) ¶¶ 18, 29.)  Thus, Hall cannot demonstrate that he was denied training or other

specialty opportunities because of race discrimination, and he cannot, therefore, survive summary judgment on his failure-to-train claims.

### IV. Conclusion

For the reasons herein, the Court grants Defendant's motion for summary judgment [35] on all claims. This case is hereby terminated.

**SO ORDERED**                           **ENTER: 12/4/12**

**JOHN Z. LEE**
**U.S. District Judge**